

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-25-00210-CR

Fernando **PEDRAZA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 454th Judicial District Court, Medina County, Texas
Trial Court No. 24-04-15126-CR
Honorable Daniel J. Kindred, Judge Presiding

Opinion by:    Lori I. Valenzuela, Justice

Sitting:        Lori I. Valenzuela, Justice
                Adrian A. Spears II, Justice
                Velia J. Meza, Justice

Delivered and Filed: July 22, 2026

AFFIRMED

A jury found appellant, Fernando Pedraza, guilty of possession of a controlled substance and assessed punishment at four years' confinement. In two issues on appeal, Pedraza challenges the trial court's denial of his pretrial motion to suppress, and in one issue, he asserts the trial court erred by denying his requested jury instruction under Texas Code of Criminal Procedure Article 38.23(a). We affirm the trial court's judgment.

# BACKGROUND[1]

## A. Pretrial Motion to Suppress Testimony

Pedraza filed a pretrial motion to suppress the evidence found in his vehicle following a traffic stop. He alleged his vehicle was searched without a search warrant or probable cause. A hearing was conducted on the motion, at which two witnesses testified. Trooper Julio Gomez Velez, with the Texas Department of Public Safety, testified that on January 8, 2024, he was riding with Trooper Alain Miranda as Miranda's training officer. As they were on patrol, Velez, who was in the passenger seat, saw a vehicle with dark window tint heading in the opposite direction. He told Miranda to turn around to confirm the vehicle had dark window tint before making a traffic stop. Velez said that once they were alongside the vehicle, he saw the dark window tint, and he then told Miranda "to drive a little further up," at which point he saw that the registration sticker was not properly placed on the lower left side of the windshield. Velez said he told Miranda to initiate a traffic stop, and Miranda activated the vehicle's lights.

Velez testified that as he and Miranda exited their vehicle, Pedraza stepped out of his vehicle (a Suburban), which was "not normal in a traffic stop" and the "normal public doesn't usually do that." Velez said he and Miranda immediately stepped back and opened their doors for cover. He said they unholstered their duty weapons and commanded Pedraza to stay in the vehicle, and Pedraza complied.

Velez stated that as Miranda spoke to Pedraza, he looked through the windows. He said he saw only tools and machinery, and no passenger seats, only a driver's seat, which he thought was "weird." Velez said Pedraza "was giving more information than what Trooper Miranda was asking

---

[1] On appeal, Pedraza does not challenge the validity of the stop or the sufficiency of the evidence in support of the jury's verdict.

him, just unsolicited information, and it just seemed odd." According to Velez, the "normal public doesn't give more information than they have to." Velez said Pedraza would not directly answer a question and "was speed-talking" and "stuttering his words." As Miranda was talking to Pedraza and asking for proof of insurance and a driver's license, Miranda looked at Velez and pointed to a knife on the lower left of the floorboard.

After Miranda finished the interview, Pedraza was asked to exit his vehicle and walk to the grassy side of the road. As the troopers ran Pedraza's driver's license, Velez noticed Pedraza pacing back and forth, "looking at his vehicle, looking at us, and keeping a distance from [them] more than usual, more than what in my experience that the normal public intends to do." When questioned if asking a driver to exit his car was typical during a traffic stop, Velez said it was not, but because they saw a knife at Pedraza's left foot, they did not know if other guns or knives were in the vehicle; therefore, for officer safety they had him exit the vehicle. Velez testified that they continued to talk to Pedraza who "just kept talking faster and faster, kept stuttering more [of] his words, and you could see his mouth start[ed] to dry." Velez called it "cotton mouth," which in his experience happens when a person has excessive adrenaline and nervousness and cannot control himself. Velez said that, at this point, he believed he had reasonable suspicion that Pedraza was involved in criminal activity and to ask if they could search Pedraza's vehicle. When Miranda asked Pedraza for consent to search his vehicle, Pedraza refused and the officers called for a K-9 unit.

Velez said they waited about ten to twelve minutes for the K-9 unit to arrive, during which time Pedraza's demeanor and nervousness "became drastically more excessive," and he kept wanting to walk towards his vehicle to get his phone and something to drink and to lock the vehicle "in order for us not to search" it. Velez said Pedraza was trying to keep them away from his vehicle.

Velez stated that when the K-9 unit arrived, Pedraza walked to his vehicle to prevent the dog's free-air sniff, and Velez had to forcibly move him out of the way. When the K-9 officer told Velez that the dog had alerted on the car, Velez detained Pedraza with handcuffs. Velez said Pedraza resisted the handcuffs "for some time" and the three officers had to hold him down and secure him in the handcuffs. The officers then searched the vehicle and found a glass pipe containing residue of methamphetamine, a crystalline white powder they believed to be methamphetamine, and a handgun. Velez said that after they found the items, they confirmed the window tint was illegal. He agreed the actual traffic stop was not completed until after the search.

On cross-examination, Velez was asked what factors he considered before he decided to call for the K-9 unit and he responded, "[d]ue to the totality of the circumstances." Velez explained that, in his experience, people do not exit their vehicle unless they are told to do so by an officer. According to Velez, when a person does that, it is "because when they see an officer right behind them in a traffic stop, they get so nervous their adrenaline gets so pumped up they cannot stay in one single place," especially if they are involved in criminal activity. He said the driver will try to exit the vehicle to distance themselves from the vehicle, the officer, and the traffic stop in an attempt to divert the officer from that vehicle.

Velez said Pedraza was shaking uncontrollably and numerous times wanted to re-enter his vehicle after being told that he could not do so. Ultimately, Velez retrieved Pedraza's phone from his vehicle and gave it to him so that he could find proof of insurance. Pedraza started calling other people, including his mother. Velez said due to the totality of these circumstances, he decided he had reasonable suspicion to ask for consent and when Pedraza declined, Velez called the K-9 unit. Velez acknowledged that any one of these circumstances, taken alone, would not provide reasonable suspicion.

- 4 -

The second and final witness to testify at the suppression hearing was Medina County Sheriff's Office Officer Jerry Thomas, who was the K-9 handler at the stop. Thomas testified that when he arrived on scene, he observed the two troopers off to the side of the road talking to Pedraza. Thomas said he could tell it was an animated conversation based on Pedraza's body language and "animations the male was displaying." Thomas testified that when he and his dog started walking towards Pedraza's vehicle, Pedraza intervened between him and the vehicle to the point where the trooper had to physically push him back to prevent him from getting between Thomas and Pedraza's vehicle. Thomas was able to approach the vehicle with his dog after the trooper pushed Pedraza out of the way. When his dog alerted on Pedraza's vehicle, Thomas and the troopers searched the vehicle. He said they found, in the center console where the cup holder was, a firearm, two plastic bags containing a crystal-like substances, and a pill bottle containing a crystal-like substance.

After closing arguments, the trial court recounted the testimony it heard and then stated:

> So I do think that they had reasonable suspicion to have that dog come out. I don't even think they need it honestly. I think an open-air search is – can be done just because, as long as we don't detain somebody for an unreasonable amount of time.
>
> The citations were issued at the end of the traffic stop or the warnings, so the purpose of the traffic stop was eventually completed. So I do think . . . that it was proper. . . . These things are leading a reasonable officer with their training and experience to think, hey, this requires a little more look.
>
> So I do think that there's a – was nothing improper done on the stop, so I will deny the motion.

Following the hearing, the trial court signed an order denying the motion to suppress. Although both Pedraza and the State requested findings of fact and conclusions of law, the trial did not enter any. After the motion was denied, the case went to trial before a jury.

**B. Trial Testimony**

At trial, several witnesses testified, including Pedraza. Velez's and Thomas's testimony was similar to their testimony at the suppression hearing. However, during Velez's trial testimony, the footage from his body camera was played for the jury. Because the sound is of inferior quality, Velez narrated what was happening.

Velez testified as follows:

> So with his nervous behavior and the way that he wanted to keep me away from his vehicle ever since from the start of the traffic stop, jumping – exit the vehicle, his nervous behavior, . . . his behavior of not letting me near his vehicle when I wanted to retrieve his phone, I had enough reasonable suspicion to think that it might be criminal activity happening here. So I asked [Miranda] if he wanted to search the vehicle, and at the end [Miranda] asked, What would be the probable cause? Well, I explained to him, you don't need probable cause. All you need is reasonable suspicion to ask the driver for consent. That's all you need.

When Pedraza declined consent, Velez instructed Miranda to call the Medina County Sheriff and request a K-9 unit.

Velez's bodycam footage showed Pedraza trying to approach the K-9 officer and the officers physically pushing Pedraza back onto the grass. Velez said that when the K-9 officer indicated the dog alerted to positive narcotics in the vehicle, Velez decided to place Pedraza in handcuffs. The drugs and a handgun were found during the search of Pedraza's vehicle.[2]

Miranda testified he believed Pedraza was nervous because of the "way he was talking," he "was just telling me stuff that I did not ask," for example, where he worked, who he worked for, and what he had in his vehicle. When asked for his rationale in requesting consent to search Pedraza's vehicle, Miranda responded that he asked for consent "because of him stepping out of the vehicle," "[i]t felt like he did not want us to get close to the vehicle at all," "[t]hen when he

---

[2] Thomas also testified at trial. He said a plastic container and baggies containing drugs, two loaded gun magazines, and an unloaded pistol were found during the search of Pedraza's vehicle.

was asked to step out, he was staying close to his vehicle until we asked him to move a little bit closer to ours, to the unit," and "[h]e kept looking at his vehicle, being on the phone, and keep [sic] on looking at his vehicle." Miranda also said that it was not normal for a driver to step out of the vehicle and Pedraza's "overly talking" meant he might have something to hide. Miranda agreed that the gun and multiple loaded magazines might make someone nervous.

Pedraza testified he got out of his vehicle when he was stopped because "that's what they usually do with me is they always ask me, Can you come back to – to my cruiser so we can talk." He said he got nervous when the troopers said, "Get back in your car or we will shoot you."

The jury found Pedraza guilty of possession of a controlled substance and assessed punishment at four years' confinement. This appeal ensued.

## MOTION TO SUPPRESS

In his first issue, Pedraza asserts the trial court erred in denying his motion to suppress because the officers prolonged the traffic stop and summoned a K-9 unit without reasonable suspicion. In his second issue, he asserts the trial court erred by applying an incorrect legal standard in concluding that officers may detain a motorist for a K-9 sniff without reasonable suspicion. The State responds to these complaints but also asserts Pedraza waived his complaints by affirmatively abandoning his objection to admission of the complained-of items of evidence. Because whether Pedraza waived his complaints about the trial court's denial of his motion to suppress is dispositive, we analyze that question only.

During the guilt-innocence phase of trial, the State called Diana Salas, who was employed as a forensic scientist for the Texas Department of Public Safety in its Seized Drugs section where evidence submitted to a laboratory is analyzed for the presence or absence of controlled substances. Salas was asked about State's Exhibit 7, which was a plastic pill bottle that held a substance on

which she conducted testing.[3] Salas said the tests she conducted revealed the substance to be methamphetamine. When the State offered Exhibit 7 into evidence, defense counsel stated, "no objection."

On appeal, Pedraza argues that this "no objection" statement did not, under the circumstances, constitute a waiver or abandonment of his previously preserved claim of error because he took efforts to preserve the issue by filing a written motion to suppress, developing the evidentiary record, and securing a clear adverse ruling. The State, on the other hand, argues that an examination of the record as a whole reveals that it cannot be determined whether an abandonment was understood or intended based upon the defensive theory employed by Pedraza during the course of the guilt-innocence phase. According to the State, that strategy was revealed by Pedraza's testimony when he related his version of the incident in question, he did not contest that a gun was found in his vehicle, he related that he had no concern about the search of the vehicle, and he advanced his theory that the contraband was not found in the vehicle, the video depicting the contraband was inaccurate, and there were no drugs in the vehicle.

"An adverse ruling on a pretrial motion to suppress evidence will ordinarily suffice to preserve error on appeal, and a defendant need not specifically object to the evidence when it is later offered at trial." *Thomas v. State*, 408 S.W.3d 877, 881 (Tex. Crim. App. 2013). But a defendant "must also take care not to affirmatively indicate that he has 'no objection' to the evidence that he challenged in his pretrial motion to suppress when it is later offered at trial" because "such an affirmative statement constitutes a 'waiver' of the right to raise on appeal the error that was previously preserved." *Id.* at 881–82. Here, Pedraza obtained an adverse ruling on his pretrial motion to suppress after an evidentiary hearing on the motion, and nothing more was

---

[3] Salas said she did not test the substance in the bags.

necessary to permit him to raise that adverse ruling on direct appeal. *Id.* at 883–84. Nevertheless, the question on appeal is whether, having once preserved his appellate claim of error in this manner, did Pedraza later take some affirmative action that served to forfeit it. *See id.* at 884.

The *Thomas* Court held that "the rule that a later statement of 'no objection' will forfeit earlier-preserved error is context-dependent." *Id.* at 885. An "appellate court should not focus exclusively on the statement itself, in isolation, but should consider it in the context of the entirety of the record." *Id.* "If the record as a whole plainly demonstrates that the defendant did not intend, nor did the trial court construe, his 'no objection' statement to constitute an abandonment of a claim of error that he had earlier preserved for appeal, then the appellate court should not regard the claim as 'waived,' but should resolve it on the merits." *Id.* "On the other hand, if from the record as a whole the appellate court simply cannot tell whether an abandonment was intended or understood, then . . . it should regard the 'no objection' statement to be a waiver of the earlier-preserved error." *Id.* "Under the latter circumstances, the affirmative 'no objection' statement will, by itself, serve as an unequivocal indication that a waiver was both intended and understood." *Id.* at 885–86.

"If, even after reviewing the whole record, it remains ambiguous whether waiver was intended, the court should resolve the ambiguity in favor of a finding of waiver." *Stairhime v. State*, 463 S.W.3d 902, 906 (Tex. Crim. App. 2015). For example, we recently held that a complaint was not preserved for appellate review because there was "nothing in this record to indicate that defense counsel intended to preserve the suppression issue following the pretrial ruling." *Castleberry v. State*, No. 04-24-00774-CR, 2026 WL 607289, *2 (Tex. App.—San Antonio Mar. 4, 2026, pet. filed) (mem. op., not designated for publication).

To determine whether Pedraza forfeited his earlier-preserved error, we must consider his "no objection" statement "in the context of the entirety of the record." *Thomas*, 408 S.W.3d at 885. Pedraza was indicted for intentionally and knowingly possessing a controlled substance, namely, methamphetamine, in an amount of four grams or more but less than 200 grams. His pretrial motion to suppress sought to suppress all testimony and evidence associated with the seizure from his vehicle of "an alleged controlled substance, an alleged dangerous drug, and a firearm."

The trial record reveals Pedraza affirmatively stated "no objection" to the admission of this same evidence: (1) footage from the body cameras of Velez and Thomas; (2) State's Exhibit 5, which was a photo showing the pill bottle, inside of which was a white crystal-like substance and two gun magazines that were found in the center console; (3) State's Exhibit 6, which was a photo of the gun with an empty chamber; and (4) State's Exhibit 8, which was Salas's written report showing the test result of methamphetamine. None of Pedraza's "no objection" statements were accompanied by any previous or contemporaneous reminders to the trial court or the State that his suppression motion had covered this evidence.

During Pedraza's testimony, he claimed the video showing the officers telling him not to exit his vehicle was "totally different [from] what happened that day." He said he was not concerned about having his vehicle searched; he just could not understand why the officers wanted to search it if the traffic stop was for window tint and the position of his inspection sticker. He said if the officers had asked if he had any weapons, he would have told them that he had a gun. He denied having any drugs in the vehicle and he did not know how the drugs got into the vehicle.

During the jury charge conference, Pedraza requested an instruction under Texas Code of Criminal Procedure Article 38.23(a) that no unlawfully obtained evidence could be admitted against him. Defense counsel argued as follows:

We're requesting a 38.23 instruction to the jury regarding facts that we believe are disputed that underlie the reasonable suspicion that the cops, you know, had in order to do this search and extend . . . the detention in order to bring out the drug dog.

I believe that the facts in dispute are that he was unusually nervous and that he was laughing nervously. Those are the two facts in dispute and I believe that from [sic] his testimony countered that – those facts that the officers testified to, and so we're asking for that 38.23 instruction around those factors because that was part of the articulation of the officers' reasonable suspicion.

Counsel did not remind the trial court about the previously denied motion to suppress or ask that the court reconsider its ruling on the motion. The court denied the requested instruction.

During closing arguments,[4] defense counsel reminded the jury that Pedraza testified the drugs were not his and he did not know how they got into his vehicle. Counsel argued that the State could have, but did not, fingerprint the container in which the methamphetamine was stored. Counsel did not challenge the State's witnesses' testimony that Pedraza was nervous or otherwise argue the officers did not have grounds to search Pedraza's vehicle.

After reviewing the entire record, we conclude the record here is ambiguous at best, and it does not "plainly demonstrate" that waiver was not intended or understood; therefore, Pedraza's complaints about the denial of his motion to suppress were not preserved for appellate review. *See Castleberry*, 2026 WL 607289, at *1–2.

Because his complaints have not been preserved, we overrule Pedraza's first and second issues.[5]

---

[4] Neither side made an opening statement before trial.

[5] Because we conclude Pedraza's first and second issues were not preserved for our review, we do not address the merits of these complaints. *See* TEX. R. APP. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal.").

## JURY INSTRUCTION

In his third issue, Pedraza asserts the trial court erred by refusing his request that the jury charge include an instruction under Texas Code of Criminal Procedure Article 38.23(a).

### A. Standard of Review

"When the trial judge fails to correctly charge the jury on the applicable law, the integrity of the verdict is called into doubt[.]" *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). "An erroneous or incomplete jury charge, however, does not result in automatic reversal of a conviction." *Id.* Appellate review of error in a jury charge involves a two-step process. *Id.* Initially, we determine whether error occurred; if so, we must then evaluate whether sufficient harm resulted from the error to require reversal. *Id.* at 731–32. "The standard of review for jury charge error depends on whether the error was preserved." *Jordan v. State*, 593 S.W.3d 340, 346 (Tex. Crim. App. 2020). At the jury-charge conference, Pedraza requested a jury instruction under Article 38.23(a). Therefore, he preserved his jury-charge complaint, and we will review error, if any, for "some harm." *Id.* at 346–47. "'Some harm' means actual harm and not merely a theoretical complaint." *Id.* at 347. "Reversal is required if the error was calculated to injure the rights of the defendant." *Id.*; TEX. CODE CRIM. PROC. art. 36.19. "To assess harm, we must evaluate the whole record, including the jury charge, contested issues, weight of the probative evidence, arguments of counsel, and other relevant information." *Jordan*, 593 S.W.3d at 347.

### B. Applicable Law

Article 38.23(a) provides as follows:

> No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

TEX. CODE CRIM. PROC. art. 38.23(a).

A defendant must satisfy three requirements before he is entitled to the submission of an Article 38.23(a) instruction: (1) "the evidence heard by the jury must raise an issue of fact"; (2) "the evidence on that fact must be affirmatively contested"; and (3) "the contested factual issue must be material to the lawfulness of the challenged conduct" in obtaining the evidence. *Hamal v. State*, 390 S.W.3d 302, 306 (Tex. Crim. App. 2012); *Madden v. State*, 242 S.W.3d 504, 510 (Tex. Crim. App. 2007). "There must be a genuine dispute about a material fact." *Madden*, 242 S.W.3d at 510. "If there is no disputed factual issue, the legality of the conduct is determined by the trial judge alone, as a question of law." *Id.* "[I]f other facts, not in dispute, are sufficient to support the lawfulness of the challenged conduct, then the disputed fact issue is not submitted to the jury because it is not material to the ultimate admissibility of the evidence." *Id.* "The disputed fact must be an essential one in deciding the lawfulness of the challenged conduct." *Id.* at 511.

**C. Analysis**

Pedraza requested the instruction because he believed there were disputed facts underlying the reasonable suspicion the troopers had in order to conduct the search and extend the detention to bring out the K-9 unit. Pedraza contended the facts he believed to be in dispute were that he was unusually nervous and that he was laughing nervously. Defense counsel argued the following during the charge conference:

"The evidence heard by the jury must raise an issue of fact." I believe on unusual nervousness, I think "nervous" and "scared" in this context when cops are pulling you over is synonymous. Like, that is how people use those words. They use them synonymously, and so the issue of fact about unusually nervous and nervous laughter is up for debate because he testified that he was not scared.

"The evidence of the fact must be affirmatively contested." I believe that is an affirmative contesting of that fact. And the "contested factual issue must be material to the lawfulness." The officer is using the nervousness to articulate how he got to reasonable suspicion to extend the detention, and so that is – that is material to that.

Assuming without deciding that the evidence heard by the jury on whether Pedraza was unusually nervous raised an issue of fact, we conclude that evidence was not affirmatively contested and this factual issue was not material to the lawfulness of the challenged conduct. Although Velez and Miranda agreed Pedraza was compliant with their requests, they both testified he was nervous throughout their encounter. Pedraza admitted he was nervous when the troopers told him to get back inside his vehicle or they would shoot him. He did not otherwise deny being nervous. Thus, we conclude there was no affirmative evidence in the record that Pedraza did *not* display unusual nervousness. *See id.* at 513–14. But even if there was affirmative evidence that Pedraza did not, in fact, appear to be unusually or excessively nervous, the troopers still had ample basis for reasonable suspicion to detain Pedraza to await the arrival of the K-9 unit. *See id.* at 514.

In addition to Pedraza's alleged nervousness, Velez testified he thought it was necessary to investigate further because from the start of the traffic stop Pedraza wanted to exit his vehicle, which Velez did not believe was normal; his talking fast; his cotton mouth; Pedraza was shaking his hands and "just did not wanting us nowhere [sic] near his vehicle." Miranda testified his rationale in requesting consent to search Pedraza's vehicle was based on Pedraza "stepping out of the vehicle," "[i]t felt like he did not want us to get close to the vehicle at all," "[t]hen when he was asked to step out, he was staying close to his vehicle until we asked him to move a little bit closer to ours, to the unit," and "[h]e kept looking at his vehicle, being on the phone, and keep [sic] on looking at his vehicle." Miranda also said that it was not normal to step out of the vehicle and Pedraza's "overly talking" meant he might have something to hide.

To obtain an Article 38.23(a) jury instruction, the disputed fact must be one that affects the determination of the legal issue. If the troopers did not have reasonable suspicion to detain Pedraza unless he acted nervously, then a dispute about that fact would require a jury instruction. If, however, Pedraza's alleged nervousness is not a fact that was crucial to a legal finding of reasonable suspicion, then that disputed fact issue need not be submitted to the jury. *See id.* at 516–17.

We conclude the alleged disputed fact was not material, much less essential, in deciding the lawfulness of the challenged conduct. "In the present case, therefore, even if there had been affirmative evidence to raise a disputed fact issue about whether [the troopers] reasonably believed that [Pedraza] was or was not nervous, the trial judge did not err in declining to submit any jury instruction on that immaterial fact[.]" *Id.* at 518. Therefore, we overrule Pedraza's third issue.

## CONCLUSION

For the reasons stated above, we affirm the trial court's judgment of conviction.

Lori I. Valenzuela, Justice

DO NOT PUBLISH